## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| KEVIN J. NIBLOCK, on behalf of himself and all others similarly situated, | Case No.: _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| MARINEMAX, INC., | **DEMAND FOR A JURY TRIAL** |
| Defendant. | |

Kevin J. Niblock ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant MarineMax, Inc., ("MarineMax" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.     This class action arises from MarineMax's failure to protect highly sensitive data.

2.     MarineMax is Florida-based boat dealer that also offers services like financing, insurance, and educational programs.[1]

3.     As such, MarineMax stores a litany of highly sensitive personal identifiable information ("PII") about its current and former employees. But MarineMax lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.     Upon information and belief, cybercriminals had access to Defendant's systems from March 1, 2024 until March 10, 2024.[2] In other words, MarineMax had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' PII for an entire *ten days*.

5.     On information and belief, cybercriminals were able to breach MarineMax's systems because MarineMax failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, MarineMax's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6.     Plaintiff is a Data Breach victim, having received a breach notice— attached as Exhibit A.  He brings this class action on behalf of himself, and all others harmed by MarineMax's misconduct.

---

[1] https://www.marinemax.com/marinemax-experience (last visited August 16, 2024).
[2] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://ago.vermont.gov/sites/ago/files/documents/2024-07-16%20MarineMax%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited August 16, 2024).

7.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former employees' and/or customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

8.     Plaintiff, Kevin Niblock, is a natural person and citizen of Virginia. He resides in Hampton, Virginia where he intends to remain.

9.     Defendant, MarineMax, Inc. is a corporation organized under the state laws of Florida with its principal place of business located at 2600 McCormick Drive, #200, Clearwater, Florida 33758.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and MarineMax are citizens of different states. And there are over 100 putative Class members.

11.     This Court has personal jurisdiction over MarineMax because it is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

12.     Venue is proper in this Court because MarineMax's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### *MarineMax Collected and Stored the PII of Plaintiff and the Class*

13.     MarineMax touts itself as the "Nation's leading premium boat dealer" that offers financing, insurance, and educational programs in addition to boat sales.[3]

14.     As part of its business, MarineMax receives and maintains the PII of thousands of its current and former employees.

15.     In collecting and maintaining the PII, MarineMax agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII.

16.     Under state and federal law, businesses like MarineMax have duties to protect its current and former employees' PII and to notify them about breaches.

17.     MarineMax recognizes these duties, declaring in its "Privacy Notice" that it is "committed to protecting and preserving your privacy" and promises that "[a]ny information collected by MarineMax will not be rented, sold, or traded to any outside sources."[4]

### *MarineMax's Data Breach*

18.     On March 10, 2024, MarineMax "discovered [it was] the victim of a cybersecurity incident." Following an investigation into the incident, it

---

[3] *Id.*
[4] https://www.marinemax.com/privacy-policy (last visited August 16, 2024).

"determined that an unauthorized third party gained access to our environment."
Ex. A.

19.     Worryingly, Defendant admits that the cybercriminals not only
accessed the environment, but that the unauthorized third party actually *acquired*
data, including victims' PII. Ex. A.

20.     While Defendant initially stated in its March 12, 2024 SEC filing that
no sensitive data was stored on the compromised systems, two weeks later, in a
new filing, it confirmed that the attackers had stolen personal data belonging to an
undisclosed number of its employees and customers.

21.     Because of MarineMax's Data Breach, the PII of current and former
employees was compromised, including but not limited to their names and Social
Security numbers. Ex. A.

22.     In total, MarineMax injured at least 123,494 persons—via the
exposure of their PII—in the Data Breach.[5] Upon information and belief, these
123,494 persons include its current and former employees and/or customers.

23.     And yet, MarineMax waited until July 16, 2024, before it began
notifying the class—over four months after it discovered the Data Breach. Ex. A.

24.     Thus, MarineMax kept the Class in the dark—thereby depriving the
Class of the opportunity to try and mitigate their injuries in a timely manner.

---

[5] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/07822acb-6bb3-4bf8-8ea6-9a7b98f106c0.html (last visited August 16, 2024).

25.     And when MarineMax did notify Plaintiff and the Class of the Data Breach, MarineMax acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, encouraging Plaintiff and the Class to:

       a.     "remain vigilant against the potential for identity theft and fraud;"

       b.     "monitor your accounts and credit reports for any suspicious activity;"

       c.     "consider placing a fraud alert on your credit file;"

       d.     "report known or suspected identity theft to law enforcement." Ex. A.

26.     MarineMax failed its duties when its inadequate security practices caused the Data Breach. In other words, MarineMax's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, MarineMax caused widespread injury and monetary damages.

27.     Since the breach, MarineMax has declared that it "implemented additional security measures." Ex. A. But this is too little too late. Simply put, these measures—which MarineMax now recognizes as necessary—should have been implemented *before* the Data Breach.

28.     On information and belief, MarineMax failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

29.    Further, the Notice of Data Breach shows that MarineMax cannot—or will not—determine the full scope of the Data Breach, as MarineMax has been unable to determine precisely what information was stolen and when.

30.    MarineMax has done little to remedy its Data Breach. True, MarineMax has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that MarineMax inflicted upon them.

31.    Because of MarineMax's Data Breach, the sensitive PII of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

32.    Worryingly, the cybercriminals that obtained Plaintiff's and Class members' PII appear to be the notorious cybercriminal group "Rhysida."[6]

33.    Notably, it was reported that Rhysida exfiltrated extensive data—and then threatened to *sell* the data for 15 Bitcoin.[7]

---

[6]    https://www.securityweek.com/marinemax-notifying-123000-of-data-breach-following-ransomware-attack/ (last visited August 16, 2024).

[7] *Id.*



34.     Likewise, several other cyber security companies reported that Rhysida was responsible for the Data Breach.[8]



<hr />

[8]          https://cybernews.com/news/marinemax-yachts-ransomware-attack-rhysida-gang/; https://www.comparitech.com/news/yacht-retailer-marinemax-inc-notifies-123-5k-of-data-breach-following-rhysida-ransomware-attack/;
https://www.bleepingcomputer.com/news/security/yacht-giant-marinemax-data-breach-impacts-over-123-000-people/ (last visited August 16, 2024).



35.    According to the countdown clock on Rhysida's posts, MarineMax had a limited amount of time to pay the gang's undisclosed ransom amount, or its data was to be sold to the highest bidder.[9]

---

[9]            https://cybernews.com/news/marinemax-yachts-ransomware-attack-rhysida-gang/; https://dailysecurityreview.com/security-spotlight/marinemax-data-breach-rhysida-ransomware/ (last visited August 16, 2024).



36.   The group posted numerous samples of the alleged stolen data, which appear to include MarineMax's earnings reports, balance sheets, bank account wire transfers, and other financial documents.[10]

37.   Critically, Rhysida is notorious for "double extortion"— demanding a ransom payment to decrypt victim data and threatening to publish the sensitive exfiltrated data unless the ransom is paid.[11]

38.   And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data

---

[10]   https://cybernews.com/news/marinemax-yachts-ransomware-attack-rhysida-gang/    (last visited August 16, 2024).
[11]   https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-319a (last visited August 16, 2024).

from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[12]

39.     Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

### Plaintiff's Experiences and Injuries

40.     Plaintiff Kevin Niblock is a former employee of MarineMax—having worked for MarineMax from approximately 1999-2000.

41.     Thus, MarineMax obtained and maintained Plaintiff's PII.

42.     As a result, Plaintiff was injured by MarineMax's Data Breach.

43.     As a condition of his employment with Defendant, Plaintiff provided MarineMax with his PII. MarineMax used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

44.     Plaintiff provided his PII to MarineMax and trusted the company would use reasonable measures to protect it according to MarineMax's internal policies, as well as state and federal law. MarineMax obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

---

[12] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

45.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

46.    Plaintiff received a Notice of Data Breach dated July 16, 2024.

47.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

48.    Through its Data Breach, MarineMax compromised at least Plaintiff's name and Social Security number.

49.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, MarineMax directed Plaintiff to take those steps in its breach notice.

50.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

51.    Because of MarineMax's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

52.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

53.   Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that MarineMax was required to adequately protect.

54.   Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because MarineMax's Data Breach placed Plaintiff's PII right in the hands of criminals.

55.   Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

56.   Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in MarineMax's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

57.   Because of MarineMax's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.   loss of the opportunity to control how their PII is used;

b.   diminution in value of their PII;

c.   compromise and continuing publication of their PII;

d.   out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

13

e.   lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.   delay in receipt of tax refund monies;

g.   unauthorized use of their stolen PII; and

h.   continued risk to their PII—which remains in MarineMax's possession—and is thus as risk for futures breaches so long as MarineMax fails to take appropriate measures to protect the PII.

58.   Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

59.   The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

60.   It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

61.   One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are

both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

62.     The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

63.     In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

64.     MarineMax disclosed the PII of Plaintiff and Class members for criminals to use in the conduct of criminal activity. Specifically, MarineMax opened up, disclosed, and exposed the PII of Plaintiff and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

65.    MarineMax's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

**MarineMax Knew—Or Should Have Known—of the Risk of a Data Breach**

66.    MarineMax's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

67.    In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[13]

68.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

---

[13] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.
[14] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

69.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in MarineMax's industry, including Defendant.

### *MarineMax Failed to Follow FTC Guidelines*

70.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

71.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[15]  The FTC declared that, *inter alia*, businesses must:

    a.     protect the personal customer information that they keep;

    b.     properly dispose of personal information that is no longer needed;

    c.     encrypt information stored on computer networks;

    d.     understand their network's vulnerabilities; and

    e.     implement policies to correct security problems.

---

[15] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016)      https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

72.     The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

73.     Furthermore, the FTC explains that companies must:

    a.     not maintain information longer than is needed to authorize a transaction;

    b.     limit access to sensitive data;

    c.     require complex passwords to be used on networks;

    d.     use industry-tested methods for security;

    e.     monitor for suspicious activity on the network; and

    f.     verify that third-party service providers use reasonable security measures.

74.     The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.     In short, MarineMax's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former

employees' and/or customers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### *MarineMax Failed to Follow Industry Standards*

76.    Several best practices have been identified that—at a *minimum*— should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

77.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

78.    MarineMax failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

79.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, MarineMax opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered by MarineMax in March 2024, including all those individuals who received notice of the breach.

81.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which MarineMax has a controlling interest, any MarineMax officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

82.     Plaintiff reserves the right to amend the class definition.

83.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

84.     <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in MarineMax's custody and control. After all, MarineMax already identified some individuals and sent them data breach notices.

85. <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least 123,494 members.

86. <u>Typicality</u>. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

87. <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

88. <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

  a.  if MarineMax had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

  b.  if MarineMax failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      if MarineMax were negligent in maintaining, protecting, and securing PII;

d.      if MarineMax breached contract promises to safeguard Plaintiff and the Class's PII;

e.      if MarineMax took reasonable measures to determine the extent of the Data Breach after discovering it;

f.      if MarineMax's Breach Notice was reasonable;

g.      if the Data Breach caused Plaintiff and the Class injuries;

h.      what the proper damages measure is; and

i.      if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

89.   <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against MarineMax would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale,

provides comprehensive supervision by a single court, and presents no unusual management difficulties.

### FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Class)**

90.    Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

91.    Plaintiff and the Class entrusted their PII to MarineMax on the premise and with the understanding that MarineMax would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

92.    MarineMax owed a duty of care to Plaintiff and Class members because it was foreseeable that MarineMax's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

93.    MarineMax has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

94.    MarineMax owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom MarineMax knew or should have known would suffer injury-in-fact from MarineMax's inadequate security practices. After all, MarineMax actively sought and obtained Plaintiff and Class members' PII.

95.   MarineMax owed—to Plaintiff and Class members—at least the following duties to:

     a.   exercise reasonable care in handling and using the PII in its care and custody;

     b.   implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

     c.   promptly detect attempts at unauthorized access;

     d.   notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

96.   Thus, MarineMax owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

97.   MarineMax also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

98.   MarineMax knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the

Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

99.     MarineMax's duty to use reasonable security measures arose because of the special relationship that existed between MarineMax and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted MarineMax with their confidential PII, a necessary part of obtaining services from Defendant.

100.    Under the FTC Act, 15 U.S.C. § 45, MarineMax had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII.

101.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of MarineMax's duty to protect Plaintiff and the Class members' sensitive PII.

102.    MarineMax violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. MarineMax's conduct was particularly unreasonable given the nature and amount of PII MarineMax had collected and stored and the foreseeable consequences of a data breach, including,

specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

103. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that MarineMax hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access MarineMax's databases containing the PII —whether by malware or otherwise.

104. PII is highly valuable, and MarineMax knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

105. MarineMax improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

106. MarineMax breached these duties as evidenced by the Data Breach.

107. MarineMax acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

    a.  disclosing and providing access to this information to third parties and

    b.  failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

108. MarineMax breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and

securing the personal information and PII of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

109. MarineMax further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

110. MarineMax has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

111. As a direct and traceable result of MarineMax's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

112. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

113. MarineMax's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and

27

were caused by MarineMax's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

114.    Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

115.    Plaintiff and Class members were required to provide their PII to MarineMax as a condition of receiving employment provided by Defendant. Plaintiff and Class members provided their PII to MarineMax or its third-party agents in exchange for MarineMax's employment.

116.    Plaintiff and Class members reasonably understood that a portion of the funds derived from their labor with MarineMax would be used to pay for adequate cybersecurity measures.

117.    Plaintiff and Class members reasonably understood that MarineMax would use adequate cybersecurity measures to protect the PII that they were required to provide based on MarineMax's duties under state and federal law and its internal policies.

118.    Plaintiff and the Class members accepted MarineMax's offers by disclosing their PII to MarineMax in exchange for employment.

119.    In turn, and through internal policies, MarineMax agreed to protect and not disclose the PII to unauthorized persons.

120.   In its Privacy Policy, MarineMax represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

121.   Implicit in the parties' agreement was that MarineMax would provide Plaintiff and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

122.   After all, Plaintiff and Class members would not have entrusted their PII to MarineMax in the absence of such an agreement with Defendant.

123.   Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

124.   The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

125.   Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

126.   MarineMax materially breached the contracts it entered with Plaintiff and Class members by:

  a.     failing to safeguard their information;

29

b.   failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.   failing to comply with industry standards;

d.   failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.   failing to ensure the confidentiality and integrity of the electronic PII that MarineMax created, received, maintained, and transmitted.

127.   In these and other ways, MarineMax violated its duty of good faith and fair dealing.

128.   MarineMax's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

129.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

130.   Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by MarineMax's conduct.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

131.   Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

132.   Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled

30

to the protection of this information against disclosure to unauthorized third parties.

133.   MarineMax owed a duty to its current and former employees and/or customers, including Plaintiff and the Class, to keep this information confidential.

134.   The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII is highly offensive to a reasonable person.

135.   The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

136.   The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

137.   MarineMax acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

138.   MarineMax acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

139.    Acting with knowledge, MarineMax had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

140.    As a proximate result of MarineMax's acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

141.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

142.    Unless and until enjoined and restrained by order of this Court, MarineMax's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by MarineMax with their inadequate cybersecurity system and policies.

143.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to MarineMax's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end MarineMax's inability to safeguard the PII of Plaintiff and the Class.

144.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class members, also seeks compensatory damages for MarineMax's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

145.   Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

146.   This claim is pleaded in the alternative to the breach of implied contract claim.

147.   Plaintiff and Class members conferred a benefit upon Defendant. After all, MarineMax benefitted from using their PII and labor to facilitate employment.

148.   MarineMax appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

149.   Plaintiff and Class members reasonably understood that MarineMax would use adequate cybersecurity measures to protect the PII that they were required to provide based on MarineMax's duties under state and federal law and its internal policies.

150.   MarineMax enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

151.   Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, MarineMax instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class

members, on the other hand, suffered as a direct and proximate result of MarineMax's failure to provide the requisite security.

152. Under principles of equity and good conscience, MarineMax should not be permitted to retain the full value of Plaintiff's and Class members' employment and/or payment because MarineMax failed to adequately protect their PII.

153. Plaintiff and Class members have no adequate remedy at law.

154. MarineMax should be compelled to disgorge into a common fund— for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

155. Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

156. Given the relationship between MarineMax and Plaintiff and Class members, where MarineMax became guardian of Plaintiff's and Class members' PII, MarineMax became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) MarineMax did and does store.

157.    MarineMax has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of MarineMax's relationship with them—especially to secure their PII.

158.    Because of the highly sensitive nature of the PII, Plaintiff and Class members would not have entrusted Defendant, or anyone in MarineMax's position, to retain their PII had they known the reality of MarineMax's inadequate data security practices.

159.    MarineMax breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

160.    MarineMax also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

161.    As a direct and proximate result of MarineMax's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### SIXTH CAUSE OF ACTION
### Violation of Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201, *et seq.*
### (On Behalf of Plaintiff and the Class)

162.    Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

163.   This cause of action is brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

164.   The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

165.   Another purpose of FDUTPA is to construe consumer protection as "consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

166.   Plaintiff and Class members all constitute "[c]onsumers" under FDUTPA because they are all "individual[s]." Fla. Stat. § 501.203.

167.   Plaintiff and Class members each constitute an "[i]nterested party or person" under FDUTPA because they are all "affected by a violation" of FDUTPA. Fla. Stat. § 501.203.

168.   FDUTPA applies to MarineMax because MarineMax engages in "[t]rade or commerce" as defined as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203.

169.   FDUTPA declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

36

170.    FDUTPA provides that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act." Fla. Stat. § 501.204(2).

171.    Relevant here, is that "[v]iolation[s]" of FDUTPA is broadly defined to include violations of:

  a.    "Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 *et seq*." Fla. Stat. § 501.203.

  b.    "The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts." Fla. Stat. § 501.203.

  c.    "Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203.

172.    Under FCRA, the FTCA, and Florida law (Fla. Stat. § 456.057 and § 501.171), MarineMax was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class members' PII. MarineMax was also under an obligation expressly under Florida law, where MarineMax is headquartered and managed, to adequately protect Plaintiff's and Class members' PII.

173.    Moreover, FDUTPA requires that MarineMax (1) take reasonable measures to protect and secure data in electronic form containing PII; (2) take reasonable measures to dispose of or destroy PII; and (3) provide notice to

consumers and consumer reporting agencies subject to the FCRA when a data security incident occurs that compromises PII. Fla. Stat. §§ 501.171.

174.   MarineMax violated FDUTPA by, *inter alia*:

    a.   failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' PII, which was a direct and proximate cause of the Data Breach;

    b.   failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.   failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

    d.   omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' PII; and

    e.   omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties

pertaining to the security and privacy of Plaintiff's and Class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*

175.   MarineMax's omissions were material because they were likely to deceive reasonable consumers about the adequacy of MarineMax's data security and ability to protect the confidentiality of their PII.

176.   MarineMax intended to mislead Plaintiff and Class members and induce them to rely on its omissions.

177.   Had MarineMax disclosed to Plaintiff and Class members that its data systems were not secure—and thus vulnerable to attack—MarineMax would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. MarineMax accepted the PII that Plaintiff and Class members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class members acted reasonably in relying on MarineMax's omissions, the truth of which they could not have discovered through reasonable investigation.

178.   MarineMax acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class members' rights.

179.   As a direct and proximate result of MarineMax's unfair and deceptive acts and practices, Plaintiff and Class members have suffered and will continue to

suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

180.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

181.   Plaintiff and Class members seek declaratory judgement that MarineMax's practices were unreasonable and inadequate and thus caused the Data Breach.

182.   Plaintiff and Class members seek injunctive relief enjoining the wrongful acts described supra and requiring MarineMax to use and maintain proper standards for data security including, inter alia, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing. Fla. Stat. § 501.211(1).

183.   Plaintiff and Class members seek all monetary and non-monetary relief allowed by law. Plaintiff seeks actual damages, attorneys' fees, and costs under Fla. Stat. §§ 501.2105, 501.211(2).

### SEVENTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiff and the Class)

184.   Plaintiff incorporates by reference paragraphs 1–89 as if fully set forth herein.

185.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

186.   In the fallout of the Data Breach, an actual controversy has arisen about MarineMax's various duties to use reasonable data security. On information and belief, Plaintiff alleges that MarineMax's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

187.   Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.   MarineMax owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

   b.   MarineMax has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

   c.   MarineMax breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

   d.   MarineMax breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class members.

188.   The Court should also issue corresponding injunctive relief requiring MarineMax to use adequate security consistent with industry standards to protect the data entrusted to it.

189.   If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if MarineMax experiences a second data breach.

190.   And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

191.   If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that MarineMax could experience if an injunction is issued.

192.   An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class members respectfully request judgment against MarineMax and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Enjoining MarineMax from further unfair and/or deceptive practices;

E. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: August 20, 2024

Respectfully submitted,

By: /s/  Mariya Weekes
Mariya Weekes (FL Bar No. 56299)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL  33134
Tel:  (786) 879-8200
Fax: (786) 879-7520
mweekes@milberg.com

Brittany Resch*
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
bresch@straussborrelli.com


*Pro hac vice forthcoming

 *Attorneys for Plaintiff and Proposed Class*